SARA SHEA "SALLY" DAVIS,

     **Plaintiff,**

**vs.**

Civil Action No. _____

**METRO PARKS AND RECREATION,
DEPARTMENT, and the METROPOLITAN
GOVERNMENT OF NASHVILLE AND
DAVIDSON COUNTY, TENNESSEE**

**JURY TRIAL DEMANDED**

     **Defendants.**

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

COMES NOW the Plaintiff, Sara SHEA "Sally" Davis, a current employee of the Metro Parks and Recreation Department, Metropolitan Government of Nashville and Davidson County, Tennessee, and brings this Complaint for Damages and Injunctive Relief against her current and longtime employer, the Defendant, Metro Parks and Recreation Department, for harassment and retaliation against her in violation of the law. In support thereof, Plaintiff states as follows:

### JURISDICTION

1. This Court has jurisdiction over Plaintiff's claims (A) pursuant to 42 U.S.C. §1983, 28 U.S.C. §1331, and 28 U.S.C. §1343(a)(3) and (4) in that this civil action arises under the laws of the United States and it seeks, among other things, to secure equitable and other relief to redress the deprivation of a right, privilege or immunity secured by the Constitution or under acts of Congress providing for the protection of civil rights; (B) pursuant to 42 U.S.C. §2000e, *et seq.*, Title VII of the Civil Rights Act of 1964 in that this civil action seeks relief from retaliation against Plaintiff because she filed a complaint of

1

discrimination based on sex, and (C) supplemental jurisdiction pursuant to 28 U.S.C. §1367 in that this civil action also seeks relief under the Tennessee Human Rights Act, T.C.A. §4-21-101, *et seq*.

2. At all times relevant, Defendants are and have been an employer within the meaning of Title VII, 42 U.S.C. §2000e, *et seq*., and within the meaning of the Tennessee Human Rights Act, T.C.A. §4-21-101, *et seq*.

3. Plaintiff received her Notice of Right to Sue from the Equal Employment Opportunity Commission (EEOC), dated January 31, 2017 regarding her EEOC Charge No. 490-2017-00555 alleging retaliation and retaliatory harassment after engaging in a protected activity (filing a gender (female) discrimination complaint and opposing unlawful conduct).

4. The lawsuit is timely filed within 90 days after Plaintiff received her Notice of Right to Sue.

## VENUE

5. Venue is appropriate in the Middle District of Tennessee pursuant to 28 U.S.C. § 1391 (b)(c) as Defendants are located in that District and are subject to the jurisdiction of the Court; in addition, the events or omissions giving rise to the claims outlined herein occurred in this judicial district.

## PARTIES

6. Plaintiff, Sally Davis ("Ms. Davis"), is an adult female citizen of the United States, who resides in Davidson County, Tennessee, and has resided there at all times pertinent to the events referred to herein.

7. Defendant, Metro Parks and Recreation Department, is a division of the Metropolitan Government of Nashville and Davidson County ("the Department"). Service can be

2

accomplished by delivering a copy of the Summons and Complaint to the Metro Attorney: Director of Law, Jon Cooper, Metropolitan Government of Nashville, Department of Law, Metro Courthouse, Suite 108, P.O. Box 196300, Nashville, TN 37219-6300.

8. Defendant, the Metropolitan Government of Nashville and Davidson County, ("Metropolitan Government") is a metropolitan governmental entity created when the governmental and corporate functions of the City of Nashville and of Davidson County were consolidated into one entity. Service can be accomplished by delivering a copy of the Summons and Complaint to the Metro Attorney: Director of Law, Jon Cooper, Metropolitan Government of Nashville, Department of Law, Metro Courthouse, Suite 108, P.O. Box 196300, Nashville, TN 37219-6300.

## FACTS

9. Ms. Davis began working for the Department in October of 1978 as a Recreation Leader.

10. Ms. Davis has continually worked for the Department since that time, spending 23 years in the Revenue Producing Division in the following positions: Assistant Golf Course Manager, Golf Course Manager 1, Golf Course Manager 2, Golf Operations Manager and Superintendent of Golf Operations.

11. Ms. Davis was very successful at her job with the Department for those 23 years. Ms. Davis spent her early years with the Department in the Community Recreation Division—but when Tommy Lynch ("Mr. Lynch") was made Director of the Department in 2011, Ms. Davis began experiencing discriminatory treatment by Mr. Lynch based on her (Ms. Davis') sex (female), especially as to the wrongful hiring and promotion procedures Mr. Lynch used in running the Department, and the wrongful promotion procedures used in

3

making decisions regarding whether or not to promote Ms. Davis and to what position(s); and Ms. Davis experienced retaliatory treatment and harassment by Mr. Lynch.

12. These discriminatory hiring/promotion practices included how Mr. Lynch handled an opening for the position of Special Project Manager (Assistant Director) of Special Services, a position in which Ms. Davis was interested and for which she was highly qualified.

13. Knowing that Ms. Davis was interested in the position, and indeed highly qualified for it, for a period of three years, Mr. Lynch refused to open the position of Special Projects Manager (Assistant Director) of Special Services for applications so that Ms. Davis could not apply or be appointed. Mr. Lynch expressed to Ms. Davis on numerous occasions that he was not filling the position in case he had to return to the position, which was a falsehood and a pretext for discrimination.

14. When Mr. Lynch did finally open the position for applications, after 3 years of no one holding the job, he did so in an unusual and discriminatory manner to prevent Ms. Davis from being appointed; and instead placed a less-qualified male into the Special Project Manager (Assistant Director) of Special Services position, while placing Ms. Davis into the position of Special Project Manager (Assistant Director) of Community Recreation, a far less desirable position, as explained more below.

15. Rather than following the usual and customary procedure of having separate application and interview processes for each different Special Project Manager position, Mr. Lynch instead set one application process that included both positions, even though the positions required different experience and skills; given the unusual process implemented by Mr. Lynch, candidates for either job could not designate which position for which they were

4

applying or even know for which position they were being considered-- they could only know that they were applying for an Special Project Manager position.

16. Ms. Davis has a reasonable belief, based upon her personal experience with Mr. Lynch and his attitude toward her which was more negative than his attitude and treatment of similarly situated males, that Mr. Lynch designed this unusual process to deny her specifically the Special Project Manager of Special Services position, a position for which she was extremely well-qualified, and indeed for which she had been told that she was the number one qualified applicant.

17. While either Special Project Manager of Special Services or Special Project Manager of Community Recreation would have been a promotion for Ms. Davis, including a pay increase, her background, experience, and expertise made her the most qualified for Special Project Manager of Special Services and that was a more desirable position for her, as it included areas of recreation that involved revenue producing facilities, like golf, ice skating, aquatics and the Parthenon, an area in which she had already worked for many years. The golf courses create 70% of the revenue for the Department and are the major revenue producing facilities.

18. At the time the positions were listed as job openings, Ms. Davis already had many years of experience as Superintendent of Golf, a division of Special Services, and was already very familiar with the areas of responsibility that came with the job of Special Project Manager of Special Services.

19. The programs Ms. Davis had supervised in her job at the time were working well and were well-organized, exemplifying how exceedingly well she had already performed in the very division for which she wanted to be Special Project Manager (Assistant Director). Ms.

Davis already had 23 years experience in golf operations and the candidate that was chosen instead of her had no golf operations experience whatsoever. Ms. Davis was told by Mr. Lynch that Mr. Holmes, who was given the Special Project Manager position over Revenue Producing, would not be capable of handling the Community Recreation position.

20. Although Ms. Davis' experience and expertise was in the area of revenue producing facilities, and in the areas covered by Special Services, she, like the eight other applicants, was only able to apply for the combined positions despite her obvious choice, and qualifications, to apply for the Special Project Manager of Special Services position. There were four applicants who worked in the Community Recreation Division and four applicants who worked in the Revenue Producing Division.

21. Given Mr. Lynch's unusual application setup, Ms. Davis had to apply for both Special Project Manager positions at the same time, even though she was best qualified for the position of Special Project Manager of Special Services; she also had a reasonable belief that Mr. Lynch had intentionally failed to post the Special Project Manager of Special Services position because Mr. Lynch knew that he would not be able to give John Holmes (a male) the position. Mr. Lynch expressed to Jim Fyke, former Director of the Department, what his plans were – that he wanted a male in the Special Project Manager of Special Services positon. He also expressed this plan to Gordon Hampton, who was chosen to sit on the interview panel.

22. After the jobs were finally listed, the Human Relations ("HR") department created a "Recruitment List" for the most qualified candidates for the positions; Ms. Davis was told by Mr. Lynch to go through the process and whoever came out number one on the list would get the Special Project Manager position over the Revenue Producing Division.

23. Ms. Davis was listed first on the Recruitment List for both Special Project Manager positions, but was informed that she did not get the Special Services job, for which she was the most qualified applicant, and instead would be considered for the Special Project Manager of Community Recreation position, because a less-qualified male was going to be hired for the Special Project Manager of Special Services position.

24. Ms. Davis is aware that five (5) men were also interviewed for the Assistant Director positions, who were all less qualified than Ms. Davis for the Revenue Producing position; while Ms. Davis had substantial experience working in a supervisory role in the very areas covered under the Special Project Manager of Revenue Producing, none of the five male applicants had any supervisory experience in golf operation under the auspices of the Special Services position. As has been stated previously, golf operations are 70% of the division.

25. Despite the many years of applicable experience that Ms. Davis had, she was not selected for the Special Project Manager of Special Services position, and it was instead given to a less qualified male applicant with much less experience in the areas of responsibility for that position.

26. Mr. Lynch was the official with responsibility for selecting a person for both positions.

27. As a result of that improper/wrongful and illegal selection process, in June of 2013, Ms. Davis filed an internal complaint against Mr. Lynch, based on gender discrimination, with Metro's HR department for the wrongful denial to her of the Special Services position.

28. Ms. Davis' complaint was investigated internally over an extended period, but oddly without ever interviewing Ms. Davis herself; the result, predictably, was that Mr. Lynch

7

was not found to have engaged in any discriminatory practices and he did not receive any discipline.

29. It was during that investigation, and thereafter, that Mr. Lynch became increasingly hostile towards Ms. Davis and created a retaliatory hostile work environment for her.

30. Ms. Davis then began regularly documenting Mr. Lynch's increasingly hostile actions and reported the events to HR on at least two (2) separate occasions; the hostile actions by Mr. Lynch, however, did not stop until he retired from his position in March 2017.

31. As a result of Mr. Lynch's continued retaliation and harassment toward Ms. Davis, HR held a "mediation" between Mr. Lynch and Ms. Davis on or about July 28, 2015; that "mediation" did not prove successful and Ms. Davis continued to be subjected to harassment, intimidation and retaliation by Mr. Lynch on a regular basis.

32. After Ms. Davis filed her internal complaint, Mr. Lynch no longer met with her on a regular basis to discuss her division or work related items. He did, however, meet with the other Assistant Directors/Special project Managers. When he did meet with Ms. Davis, the meetings were unproductive and Mr. Lynch always brought up the subject of the prior promotions, and tried to justify what he had done. Mr. Lynch raised his voice to Ms. Davis whenever he met with her, assigning an employee subordinate to Ms. Davis to "supervise" Ms. Davis' work (despite the fact that no other Assistant Director/Special Project Manager had his work "supervised" by a subordinate employee), and engaging in conduct whereby Mr. Lynch would directly threaten Ms. Davis' job if she expressed any concern about his retaliatory and discriminatory actions toward her.

33. After filing her internal complaint, Mr. Lynch also regularly, at least once a week, used his position to bully, harass, and degrade Ms. Davis, including that he would refuse to speak to

her despite being her supervisor, would refuse to provide any feedback throughout the year on her performance, and would use her "upcoming evaluation" to intimidate Ms. Davis – basically he held the power to fire her at any moment and even if she complained to HR, as she had before, nothing would happen to him; this behavior by Mr. Lynch was in stark contrast to how he supervised Ms. Davis prior to her filing the internal charge of gender discrimination, including that he regularly provided feedback throughout the year and did not take actions or make comments which were designed to intimidate Ms. Davis.

34. Ms. Davis kept notes regarding Mr. Lynch's regular rants and threatening behavior and demeanor; again, prior to Ms. Davis filing her internal charge of gender discrimination, Mr. Lynch did not rant at Ms. Davis or act in a threatening way toward her. Ms. Davis has extensive documentation on Mr. Lynch's behavior.

35. Mr. Lynch's outbursts and harassing, intimidating and retaliatory actions toward Ms. Davis were witnessed by numerous Department staff members, including Monique Odom, Janet Frazier and others. It was common knowledge in the Department that Mr. Lynch had a vendetta (was retaliatory) against Ms. Davis.

36. On or about June 14, 2013, Mr. Lynch came to Ms. Davis' office purportedly to discuss work issues, but the conversation turned immediately to the Assistant Director of Special Services position; Ms. Davis informed him that she was still pursuing her complaint(s) regarding the interview panel and how the interviews were conducted for that position, and, in response, Mr. Lynch attempted to intimidate Ms. Davis by telling her that she was under a "six-month work test" in the position and that she had better do her job – this was said in a manner that meant to Ms. Davis that she would likely be disciplined or demoted by Mr.

9

Lynch after the six-month "test" period, not for any legitimate business reason, but rather in retaliation for Ms. Davis having filed an earlier complaint of discrimination.

37. On or about August 6, 2013, Ms. Davis met with Mr. Lynch at his request about Special Project Manager of Community Recreation position; Shain Dennison, Assistant Director of Greenways, sat in on the meeting because Mr. Lynch said he would not meet with Ms. Davis alone due to her gender discrimination complaint.

38. Mr. Lynch's tone of voice and sarcasm made clear to Ms. Davis that he was suggesting that she had done something wrong by filing a complaint/charge, that her complaint/charge was unsupported, and that he, rather than Ms. Davis, needed HR protection to make sure she did not accuse him of any additional wrongful conduct.

39. Ms. Davis experienced Mr. Lynch's sarcasm, tone of voice, and insinuations that he needed HR protection as harmful to her and her reputation.

40. On or about August 13, 2013, Ms. Davis met with Jane Madden and Alisha Carruthers of the HR Department in a recorded meeting, at which Ms. Davis asked their advice on how to deal with the harassment and retaliation she was suffering from Mr. Lynch in retaliation for having properly gone to HR with her complaint of gender discrimination; the HR personnel told Ms. Davis that there should be no retaliation or repercussions for her having filed the discrimination complaint, and that they would make sure Mr. Lynch understood that it was within Ms. Davis' rights to file the complaint and that he could not retaliate or harass her for filing it.

41. Following that conversation, and after the recorder was turned off, Jane Madden, a long-time HR employee, stated to Ms. Davis, "Sally, I just think you got your feelings hurt," which Ms. Davis experienced as dismissive of her allegations, and Ms. Davis then knew

that HR was not going to investigate her complaints fully and/or seriously, despite the seriousness of her allegations.

42. On or about August 16, 2013, Ms. Davis attended a meeting in Mr. Lynch's office with Janet Frazier, Mr. Lynch's Administrative Assistant, present by Mr. Lynch's request, to discuss "expectations" and Ms. Davis' evaluation. Ms. Davis was told in that meeting that although Mr. Lynch has an "open-door policy," she would be excluded from using that policy and that she, alone among other supervisors and employees, would instead have to check with Ms. Frazier to see if Mr. Lynch was available to speak to her -- an intentionally humiliating, unnecessary, and retaliatory punishment for having filed a discrimination complaint.

43. By excluding Ms. Davis from the open-door policy after Ms. Davis had filed a discrimination complaint, Mr. Lynch singled out Ms. Davis for retaliatory treatment because she had filed a gender discrimination complaint; Mr. Lynch was angry about that, and therefore took retaliatory and frequently public action against her to make it more difficult for her to do her job, such as essentially announcing this change of policy that only applied to Ms. Davis at a meeting with Ms. Davis' subordinate employee present and made it especially humiliating by requiring Ms. Davis to seek permission from Ms. Frazier, her subordinate employee, before she could speak with Mr. Lynch, her direct supervisor.

44. When a discrimination complaint is filed, the Department's policy is, and has historically been, to remove the employee who made the complaint from the possibility of a direct line of retaliation; here, however, HR did not make any attempt to protect Ms. Davis after she filed the discrimination complaint by changing her supervisor, or by any other concrete

steps to ensure that Mr. Lynch could not retaliate against her, and indeed, Mr. Lynch remained Ms. Davis' supervisor for a few more years until he retired in March 2017.

45.  On or about August 29, 2013, Ms. Davis sent an email to Alisha Carrethers of HR asking how she should respond to the retaliation she was experiencing from Mr. Lynch's wrongful behavior; Ms. Carrethers replied in an email stating she would contact Mr. Lynch about Ms. Davis' concerns of retaliation.

46.  Ms. Davis is not aware, however, whether the HR Department ever contacted Mr. Lynch about his retaliation, and the retaliatory actions did not stop.

47.  On or about October 3, 2013, at 9:00 AM, a meeting was scheduled in Mr. Lynch's office to discuss Ms. Davis' three-month evaluation, and at which Mr. Lynch presented Ms. Davis with grades of 1 (on a scale with 5 being the highest and 0 being the lowest) on the first two criteria of the supervisory section of the evaluation, which shocked Ms. Davis, who had never before received "1"s on her evaluations in the more than 30 years she had worked for the Department; Ms. Davis told Mr. Lynch she would not accept those grades since she knew she was performing at a much higher level—which caused Mr. Lynch to become furious and to lose his temper during the evaluation.

48.  Ms. Davis considered this behavior further retaliation for having filed a complaint that was within her rights to file.

49.  After more than 30 years of excellent reports and successful work for the Department, Ms. Davis was distraught upon receiving these unmerited, low, and humiliating evaluation scores.

50.  After having blatantly lost his temper during the evaluation, Mr. Lynch later apologized to Ms. Davis, admitted that he should not have given her those scores, and said he revised the

evaluation; Ms. Davis, however, had already suffered harm from Mr. Lynch's actions of knowingly giving her undeservedly low scores before finally correcting them.

51.  Despite having admitted his intentionally incorrect evaluation scores of Ms. Davis and telling her that he would fix them, on or about October 31, 2013, Ms. Davis nonetheless received an evaluation with lower scores than she had ever received prior to the date she filed the discrimination complaint/charge against Mr. Lynch, and without any explanation as to why

52.  Ms. Davis' behavior and conduct in her job had not changed and there should not have been a lowering of her evaluation; this lowering of the evaluation scores by Mr. Lynch was done to punish Ms. Davis for having filed a discrimination complaint against him and for having complained to HR about retaliation.

53.  Before Ms. Davis filed the complaint, her evaluations were very high, and she had continually been performing her job at the same high level for decades. The evaluations are kept in her personnel file.

54.  Between 2013 and 2014, Mr. Lynch continued to raise his voice and/or yell at Ms. Davis and make demeaning comments to her at least once per month. During 2014, she was given no guidance from Mr. Lynch as the other Special Project Managers/Assistant Directors were. He continued to ignore Ms. Davis as if she were not part of the leadership team.

55.  On or about January 30, 2015, Ms. Davis received an email from Mr. Lynch reprimanding her for missing a minor deadline, i.e. for sending a document early on a Monday morning instead of late on Friday afternoon; although it was not uncommon for an employee to miss a late Friday email deadline and simply make it up by emailing Monday early morning and was routinely considered a minor infraction by Mr. Lynch not warranting any discipline, on

January 30, 2015, Mr. Lynch took this opportunity to punish Ms. Davis with a reprimand, without any warning, again treating Ms. Davis differently (more negative) than other Special Project managers who engaged in the same minor infraction and/or much more major infractions that were not addressed by Mr. Lynch.

56. When Ms. Davis went to speak with Mr. Lynch about why he had given her a reprimand for something so minor and that was commonly ignored in all other situations, he spoke with her briefly, but then rudely told her to stop talking and dismissed her with a wave of his hand.

57. Ms. Davis had not seen Mr. Lynch speak in a dismissive manner or wave his hand toward other similarly-situated employees (those who had not filed charges/complaints).

58. Prior to Ms. Davis filing a charge/complaint of gender discrimination, Mr. Lynch never waived his hand at her in a dismissive fashion and never rudely told her to stop talking when they were meeting—and she is not aware of any times he has done that to other employees.

59. Prior to this incident, Ms. Davis had never received a written reprimand at work.

60. Ms. Davis was very concerned as to whether Mr. Lynch was going to make it a written reprimand and place it in her personnel file. She worried about it and prepared herself to take appropriate action to correct the situation if the reprimand was indeed placed in her personnel file.

61. After causing anxiety, distress, and worry to Ms. Davis regarding a reprimand for this minor deadline error, Ms. Davis has a reasonable belief that Mr. Lynch's actions in confronting her about an alleged reprimand were intended to cause Ms. Davis distress and anguish.

14

62. Ms. Davis asked that any reprimand that Mr. Lynch wrote be placed in her personnel file so that she would have a record of it, and so she could appeal the retaliatory nature of such a reprimand.

63. On or about July 6, 2015, Ms. Davis received her yearly evaluation from Mr. Lynch.

64. On or about Wednesday, July 8, 2015, Ms. Davis went to Mr. Lynch's office to discuss that evaluation, and in particular to get clarification of two sentences that were unclear, i.e. to clarify sentences alleging that Ms. Davis' peer relationships had deteriorated over the last year.

65. In response, Mr. Lynch named two individuals--Monique Odom and Mike Bays--whom he claimed had employee relationships with Ms. Davis that had deteriorated over the year; although Ms. Davis had always had a good relationship with both of those individuals, she said that she would be glad to meet with each of them to find out if they had concerns.

66. Ms. Davis also asked Mr. Lynch why he said in her evaluation that she was not 100% invested in her division, and in response, Mr. Lynch was only able to come up with a handful of lackluster, minimal examples, including that Ms. Davis had allegedly misspoken on a single occasion and called junior tennis "junior golf." Ms. Davis spoke with her administrative staff and all agreed that Mr. Lynch was incorrect and that Ms. Davis gave more than 100% in her daily work.

67. Mr. Lynch also told Ms. Davis that he was tired of people asking him why he had moved Ms. Davis from her previous division; after Ms. Davis questioned Mr. Lynch again about changing her division and giving her undeservedly low evaluation scores and comments, Mr. Lynch told her that she needed to hire a lawyer and file a lawsuit if she did not like his decisions.

68. After Ms. Davis left Mr. Lynch's office following the meeting on approximately July 8, 2015, she went directly to the office of Monique Odom, one of the people that Mr. Lynch had alleged had a compromised employee relationship with her; Ms. Odom did not indicate that she thought there was any problems with her relationship with Ms. Davis, and expressed confusion as to why Mr. Lynch would say that their working relationship had deteriorated. Mr. Lynch later apologized to Ms. Odom for verbally naming her as a person with whom Ms. Davis's relationship had deteriorated, but the harm had already been done to Ms. Davis.

69. Ms. Davis believes and alleges that the comments in her evaluation made by Mr. Lynch concerning the alleged "deteriorated" relationship between Ms. Davis and Ms. Odom were knowingly false and that Mr. Lynch wrongfully put this accusation in Ms. Davis' evaluation even though he knew the comments were untrue.

70. On or about July 9, 2015, Ms. Davis also spoke with Mike Bays, the other individual whom Mr. Lynch had said had a "deteriorated" working employee relationship with her; he too advised Ms. Davis that their working relationship was excellent, and that he did not know why Mr. Lynch would say such a thing.

71. Ms. Davis believes the comments by Mr. Lynch concerning her "deteriorated" relationship with Mr. Bays were knowingly false and that Mr. Lynch wrongfully put them in Ms. Davis' evaluation even though he knew the comments were untrue as part of the ongoing retaliation.

72. On or about July 10, 2015, Ms. Davis sent Mr. Lynch an email at approximately 10:11am to ask if she could meet with him that day; although Mr. Lynch was in the office the whole day, he did not respond to the request.

73. On that same day, Ms. Davis emailed Jason Lusk of HR to request a meeting at Metro HR

to discuss the retaliation and harassment by Mr. Lynch; she asked for his help on how to

proceed with her complaint.

74. Although her request for a meeting had nothing to do with the flawed process that had

resulted in Mr. Lynch promoting Ms. Davis to the Special Project Manager of Community

Recreation rather than the Special Services for which she was the most qualified two years

before, on approximately July 13, 2015, Ms. Davis finally received the following response

to her July 10 email from Mr. Lynch:

"I have discussed your evaluation with you as many times as I deem appropriate. It
is highly unusual from my standpoint that a good evaluation creates as much
discussion with as many subordinates. Please feel free to pursue any discriminatory
act towards you by me that you can verify. I feel that you have been **favorably
treated** with the several promotions you received while working under me. I feel
each and every one of them was done at the appropriate time and within all rules
and regulations that applied to them. I feel you deserved each and every promotion
to the position you were promoted to at the time you were promoted. I feel that I
was under the same rules and regulations that you work within. Using subordinates
to gather support for some non-existent violation is not appropriate from my
standpoint, and complaining to the general public as well is a questionable act. I am
telling those that walk up to me on the street asking what I did to you that all I did
was promote you under the rules and regulations that apply to civil service
employees. I cannot change any of the circumstances revolving around past
promotions. All were approved by my supervisor, and/or the Civil Service
Commission. Your claim of discrimination and retaliation has already been looked
into by the Human Resources Department, but you should be getting a call from
Jason Lusk about any claims you have, now. As far as retaliation is concerned an
unjust negative evaluation may be considered to be retaliation, but it needs to be
unjust and negative. When the investigation of your claim ends up in my office then
I will present what I feel is fair documentation for the numbers provided in your
evaluation. Too much work time has been invested in trying to make sure you
accept the fact that I felt and the process has proved that you were the correct
person for Community Recreation position. I felt then and feel today that is the
case."

75. Ms. Davis believes and alleges that this email from Mr. Lynch clearly demonstrates his

obsession with promotions made two years prior (and thus his focus on retaliation) which

17

were the subject of Ms. Davis' gender discrimination complaint, even when not relevant and not raised by others; here, when Ms. Davis tried to discuss the negative evaluation grades unfairly given to her by Mr. Lynch in retaliation for her having filed a gender discrimination complaint, Mr. Lynch instead continued to raise the issue of promotions from two years prior.

76. On or about July 28, 2015, Jason Lusk, HR liaison, met with Ms. Davis and Mr. Lynch together to discuss the retaliation and harassment that Ms. Davis had suffered; following that meeting with HR, however, there was again no follow up whatsoever to determine if the retaliation had stopped.

77. Approximately a month later, Ms. Davis advised Mr. Lusk that nothing had changed as a result of the meeting and that the retaliation had continued. Again, there was no follow up from HR.

78. On or about April 28, 2016, Ms. Davis was suddenly placed under the supervision of Monique Odom, Special Project Manager Finance, without any notice or explanation; Ms. Odom was classified as a Special Project Manager, the same classification level that Ms. Davis holds.

79. In addition, Mr. Lynch suddenly named Monique Odom as Deputy Director of Parks without even posting a "Recruitment Notice" for that position or opening it for applications, meaning Mr. Lynch arbitrarily promoted Ms. Odom without following proper procedures and created the "higher" position for her to single out Ms. Davis (as Ms. Davis was the only employee at her level placed as a subordinate to Ms. Odom).

80. Ms. Davis would be highly qualified to be promoted to Deputy Director at the Department, but she was not given the opportunity even to apply.

18

81. Placing Ms. Davis under Ms. Odom's supervision was, in effect, a way of demeaning Ms. Davis.

82. None of the other Assistant Directors or Special Project Managers were forced to be supervised by a peer, but instead, all other Assistant Directors and Special Project Managers answered directly to Mr. Lynch and could interact with him directly as needed, including going to his office using his "open-door policy," while Ms. Davis alone among Assistant Directors could not do either.

83. Ms. Davis' bi-weekly meetings with Mr. Lynch were then cancelled as of April 28, 2016 and instead Ms. Davis was required to meet bi-weekly with Ms. Odom. The bi-weekly meetings were to update Mr. Lynch on the division and ask for assistance with issues that may occur. All administrative staff had access to Mr. Lynch except for Ms. Davis. Every work-related issue she had in her division had to be filtered through Ms. Odom to Mr. Lynch.

84. Ms. Davis asked Ms. Odom if any of the other Assistant Directors or Project Managers were required to meet with her instead of with Mr. Lynch; Ms. Odom responded that Ms. Davis was the only one with whom she was required to meet.

85. Thereafter, Mr. Lynch refused to speak--at all--to Ms. Davis from April 28, 2016 until January 2017 except when absolutely necessary in a meeting; from January 2017 until his retirement in March 2017, Mr. Lynch did not speak with Ms. Davis even though he was at all times her direct supervisor.

86. Mr. Lynch engaged in behavior intended to alienate Ms. Davis from her peers, and intimidated, bullied, and retaliated against her.

87. Mr. Lynch has spoken on numerous occasions directly to Ms. Davis' peers and subordinates about her and her position in a negative way.

88. Mr. Lynch has demonstrated a pattern of bullying by ignoring and marginalizing Ms. Davis at work, and has refused to move past Ms. Davis' filing of a gender discrimination complaint; although several years had passed, Mr. Lynch continued to be obsessed with the fact that Ms. Davis had filed a gender discrimination complaint and made a statement to Rick Taylor that Ms. Davis should have kept her discrimination complaint "in house," meaning that she should not have filed with HR.

89. On or about September 16, 2016, Ms. Davis received a written reprimand for a minor issue for which other similarly situated co-workers have not been issued reprimands; she was again targeted by Mr. Lynch when the other Special Project Managers were not.

90. On or about August 5, 2016, all the Assistant Directors/Special Project Managers were sent an email with clear instructions to "prepare a fairly conclusive and truly operational proposal" concerning hiring seasonal youth, as well as the costs associated with hiring these youth, and given a month to formulate a plan for each of their divisions and how they would implement the plan.

91. On or about September 27, 2016, a Department meeting was held to present those plans to Mr. Lynch.

92. Ms. Davis was extremely prepared for the presentation and had three options for Mr. Lynch to choose from.

93. Two of the male Special Project Managers, John Holmes and Jim Hester, who were to present at the meeting came unprepared and did not have any plan formulated. This was a

major example of where male Special Project Mangers not following Mr. Lynch's directive were not reprimanded for coming in unprepared.

94. On or about October 4, 2016, Ms. Davis' co-worker, Shain Dennison, Special Project Manager of Greenways, was in Mr. Lynch's office and was told by Mr. Lynch to "tell your friend down there [pointing at Ms. Davis' office] that I am ready for her."

95. On or about October 18, 2016, Ms. Davis was summoned to Mr. Lynch's office to discuss the demotion of a 30-year employee ( not Ms. Davis), and during the conversation, with Ms. Odom present, Mr. Lynch stated that Ms. Davis' employment would be "in question" while discussing how Ms. Davis' staff had handled the reprimands for the demotion; since Mr. Lynch alone and not Ms. Davis or her staff was responsible to use the reprimands as support for his decision to demote the 30-year employee, there was no reason for Mr. Lynch to question Ms. Davis about the reprimands related to the 30-year employee being demoted, other than to cause distress to Ms. Davis.

96. After Ms. Davis filed the internal complaint/charge of discrimination and after Mr. Lynch began retaliating against her, she went home sick many times from the stress he caused from his retaliation and retaliatory harassment. She sought help from her physician and discussed her anxiety and distress over her work place environment many times over the four years of working in a hostile work environment.

97. On or about January 3, 2017, Ms. Davis' assistant of 14 years, Bob Benson, was suddenly and arbitrarily moved to another division by Mr. Lynch—an action that appeared to be in direct retaliation for Ms. Davis having filed a gender discrimination complaint; Ms. Davis was not even told of this reassignment until it had already been made.

21

98. Ms. Davis was called to Mr. Lynch's office after the fact and in the presence of Ms. Odom was told that her long-time assistant was being transferred; when she asked why, Ms. Davis was told that "they" had requested that he be moved and when Ms. Davis asked who "they" were, she was told it was none of her business.

99. Mr. Lynch's bullying, intimidation, and retaliation hindered workplace performance and his intentionally retaliatory behavior and conduct toward Ms. Davis created a hostile work environment not only for Ms. Davis but also for other employees who had to watch the wrongful treatment of Ms. Davis.

100. Other employees witnessed or suffered during Mr. Lynch's retaliation tactics against Ms. Davis.

101. It was also commonly known in the Department that employees could not comment about the wrongful treatment of Ms. Davis for fear of retaliation from Mr. Lynch.

102. Ms. Davis believes she was wrongfully and illegally harassed and discriminated against due to having engaged in a protected activity, i.e. for complaining about discrimination based on her sex (female) and for protesting and opposing unlawful practices.

## CAUSES OF ACTION

### Count I

### <u>Retaliation in Violation of Title VII of the Civil Rights Act of 1964</u>

103. Plaintiff incorporates all the foregoing paragraphs above as if fully set forth herein, and alleges that:

104. Plaintiff is a member of a protected class covered by Title VII, 42 U.S.C. sec. 2000e, *et seq*.

105. Plaintiff engaged in a protected activity, including that she complained about being discriminated against due to her sex/gender (female), opposed unlawful practices of the Defendants and made an EEOC charge, filed internal EEO complaints, and protested unlawful practices by the Defendants.

106. Defendants were aware of Plaintiff's protected activities.

107. Defendants, through their agents, representatives and employees, intentionally, willfully and knowingly took adverse action and/or created a hostile work environment because Plaintiff had engaged in protected activities (protesting and opposing unlawful practices) which affected the terms and conditions of her employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et. seq*.

108. Defendants, through their agents, representatives and employees, engaged in actions and omissions constituting retaliation (because Plaintiff had engaged in protected activities or opposed unlawful practices) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et. seq*.

109. As a direct and proximate result of Defendants' unlawful retaliatory conduct against Plaintiff, and as a direct and proximate result of the violations of Plaintiff's federally and Constitutionally protected rights, Plaintiff has suffered harm, including but not limited to lost wages, benefits, and damage to her reputation, embarrassment, humiliation, pain and emotional distress and loss of enjoyment of life.

## Count II

## Retaliation in Violation of the Tennessee Human Rights Act

1. Plaintiff incorporates all the foregoing paragraphs above as if fully set forth herein, and alleges that:

2. Plaintiff is an employee within the meaning of the THRA and protected thereby from retaliatory action by her employer. Defendants are employers within the meaning of THRA and are prevented from retaliating against an employee for engaging in a protected activity and/or opposing unlawful practices under the THRA.

3. Defendants, through their agents, representatives and employees, intentionally, willfully and knowingly retaliated against Plaintiff in the terms and conditions of her employment based upon her complaint of gender discrimination (because she engaged in a protected activity and/or opposed unlawful practices) in violation of the THRA. The Plaintiff endured retaliation in the form of a hostile work environment and harassment.

4. Plaintiff seeks injunctive relief to remedy the alleged wrongdoings on the basis that she has no adequate or complete remedy at law to redress the discriminatory practices of Defendants.

5. The acts and omissions of Defendants constitute a violation of Plaintiff's rights in violation of the THRA, Tenn. Code Ann. 4-21-311, *et. seq*., as amended, and have caused Plaintiff substantial damages and injuries, including loss of income and benefits, humiliation, embarrassment and emotional distress.

## **PRAYER FOR RELIEF**

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays that the Court enter a judgment in her favor against Defendants following a jury verdict in her favor and that the following relief be granted:

1. A permanent injunction against Defendants prohibiting any future discriminatory and retaliatory practices against her as there is no adequate or complete remedy at law to redress the discrimination, retaliation, and harassment;

24

2. An Order that requires Defendants to conduct training concerning the prevention of discriminatory and retaliatory practices based upon gender, and such other equitable relief as may be appropriate.

3. Back pay, lost benefits and other pecuniary and economic losses caused by the Defendants' unlawful conduct;

4. Compensatory damages and losses in an amount to be determined at trial but not less than $300,000.00;

5. All reasonable attorneys' fees, costs, pre-judgment and post-judgment interest; and

6. Such further relief as is deemed appropriate.

A JURY TRIAL IS DEMANDED.

Respectfully Submitted,

HOLLAND & ASSOCIATES, PC

*s/Maureen T. Holland, Esq. #15202*
Maureen T. Holland, Esq. #15202
Yvette Holland Kirk, Esq. #32174
1429 Madison Avenue
Memphis, TN 38104
Telephone: (901) 278- 8120
Facsimile: (901) 278-8125

RUBENFELD LAW OFFICE, PC

*s/Abby R. Rubenfeld, Esq., #6645*
Abby R. Rubenfeld B.P.R. #6645
2814 Dogwood Place
Nashville, Tennessee 37204
Telephone: 615/386-9077
Facsimile: 615/386-3897